## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

David Rossman,

        Plaintiff,

v.

RDO Equipment Co., a Delaware
corporation,

        Defendant.

**Order**

Civil File No. 04-3031 (MJD/RLE)

_____

Arlo H. Vande Vegte, counsel for Plaintiff.

Jacqueline S. Anderson, Nilles Law Firm, counsel for Defendant

_____

## I.  INTRODUCTION

This case is before the Court on the motion by Defendant RDO Equipment for summary judgment on Plaintiff David Rossman's claims of retaliation for seeking workers' compensation benefits in violation of Minn. Stat. § 176.82. The Court heard oral arguments on February 1, 2006.

## II.    FACTUAL BACKGROUND

### A.    David Rossman's Employment at RDO.

Plaintiff, David Rossman, alleges he was dismissed in retaliation for filing a workers' compensation claim.  Defendant, RDO, terminated Rossman's employment on October 10, 2003.  Thomas Ruegemer, Rossman's direct supervisor, states he made the decision to terminate Rossman based on efficiency problems and insubordination.

#### 1.    Rossman's May 2000 Workers' Compensation Claim.

Rossman began working as a service technician at RDO on June 3, 1996. RDO is a company that services heavy machinery and equipment.  On May 16, 2000, Rossman sustained a work-related injury for which he sought and received workers' compensation benefits.  Liberty Mutual, RDO's third-party insurance company, eventually paid this claim, although Rossman alleges that RDO did not promptly accept the claim.  Ruegemer acknowledged being asked questions by Liberty Mutual regarding the claim and requested that Rossman refrain from submitting workers' compensation claims for time off work for doctors' visits. Instead, Ruegemer said RDO would itself pay for those times off work.

#### 2.    Rossman's January 2003 Demotion.

No activity occurred regarding Rossman's workers' compensation claim and Rossman continued employment without issue for the next three and one-half

years.  During this time, Rossman was promoted to a supervisory position.  In January 2003 Ruegemer demoted Rossman back to his previous position as a service technician.  Rossman's rate of pay was not reduced upon his demotion.  No reason was offered, no warning given, and Rossman did not find out about his demotion until it was publicly announced at a staff meeting.  Ruegemer later stated that Rossman was removed from his supervisory position because he lacked leadership skills.

Rossman received a favorable performance evaluation for his position as service technician in February 2003.  The review noted, however, that Rossman's efficiency numbers needed improvement.  Included in the review was a discussion wherein Ruegemer performed a monetary analysis of Rossman's profitability to RDO.  Although efficiency was discussed during the review, Ruegemer downplayed the efficiency issue and did not advise Rossman that it could be cause for termination in the future.

### 3.   **Implementation of the Kilands Performance System.**

RDO initiated a new compensation system called Kilands sometime in early 2003.  Although it is unclear exactly when Kilands took effect, RDO's document introducing the system is dated April 7, 2003.  Kilands measures efficiency and was designed to be employed alongside a career track system.  Kilands was not created specifically for RDO; it was designed by John Deere for application in the

servicing of Deere machinery.  Kilands contains suggested repair times for

individual pieces of equipment and measures employees against those standards.

The Kilands system has no calculations to account for incapacity, nor does it

differentiate between atypical repair jobs that may require additional time to

complete.  Because Kilands was designed for use with John Deere equipment, it

does not contemplate machines made by other manufacturers called "off breed"

jobs.  Rossman received many such "off breed" jobs.

RDO's career track system used in conjunction with Kilands designates

employees as level one or level two service technicians.  Level one employees are

paid less and are expected to perform at a 95% Kilands efficiency rate.  Level two

employees are to perform at 100% efficiency.  Additionally, employees are

required to pass a series of tests in order to advance to the next level.  These two

systems were put in place as a means of determining employee compensation.

Thus, according to RDO's explanation of the system, a failure to achieve goals

would result in a reduction of pay commensurate with the level at which an

employee performed.  For example, if a level two employee performed at a 95%

efficiency over a period of time, his or her pay would be reduced to that of a level

one technician.

Rossman was never expressly promoted to level two status.  When Rossman

was demoted to service technician he continued to receive the same rate of pay,

which was commensurate with that of a level two technician.  Ruegemer, never

required Rossman to take the level two certification exam.  Ruegemer said this

was because Rossman was already receiving level two pay.  There are no

documents in the record that specifically denote Rossman's level.

### 4.   Rossman's Spring 2003 Workers' Compensation Claim.

Around this same time, in the spring of 2003, Rossman began to file a series

of workers' compensation claims.  On March 27, 2003, Rossman sought temporary

total disability benefits relating to his May 2000 injury.  Dr. Stephen Barron, MD

rated Rossman with a 10.5% permanent partial disability to the body as a whole.

Rossman next saw an independent medical examiner on March 29, 2003, who

confirmed the diagnosis.  Then, on April 4, 2003, Rossman exacerbated his injury

and missed one week of work.  Rossman was paid $7,875.00 on April 10, 2003 by

Liberty Mutual.

### 5.   Rossman's Efficiency Warnings.

Sometime during the spring of 2003 Ruegemer began to have concerns

about Rossman's efficiency on the job.  Ruegemer discussed his concerns with Ron

Saar, the manager for RDO product support operations in Minnesota, and with

Jeff Antonelli from human resources.  Antonelli advised Ruegemer and Saar to

follow RDO's progressive discipline procedure.  Ruegemer acknowledges that at

some point in the discipline process he mentioned that RDO had to be careful and "we needed to make sure that that process was followed, that we're not terminating him because of an injury." (Ruegemer Dep. 98.) In testifying about his initial consultation with Saar and Antonelli Ruegemer stated:

> [S]o we talked to human resources, they asked us to follow the process of documentation, we did, and after Dave Rossman was not progressing and continued to do insubordination and negative marks or negative comments, a decision was made. It was inevitable once the process was started and he was not cooperating with getting better or changing.

(Ruegemer Dep. 96.)

Rossman received a total of three warnings before his termination in October 2003. Ruegemer issued the first warning to Rossman on May 2, 2003. The warning stated that Rossman had not been listening to his supervisors and noted that Rossman's efficiency was at 86.73%. The warning ended by stating, "This is to let you know you will need to get your efficiency up to and stay over 95 percent by July 31st." (Rossman Dep. Ex. 6.) A second warning was issued on June 27, 2003, reminding Rossman that he needed to raise his efficiency to 95% by July 31, 2003. The second warning provided that the consequences for failure to comply would be as follows:

> In the event Dave fails to meet the 1st goal of attaining 95% R3 efficiency by July 31, 2003 . . . he (a) will not be eligible for a pay raise and (b) will be removed from the employee Gain Share Bonus ["GSB"] indefinitely. If Dave fails to meet the 2nd goal of attaining 100% R3 efficiency by September 30, 2003, he may receive a pay

reduction to align his compensation with his performance level (as
per the Service Technician Career Path).

(Rossman Dep. Ex. 7.)  The warning further noted that Rossman had exhibited

insubordinate behavior and gave specific examples of Rossman refusing to

perform duties requested by his supervisors.  Under "management action" it

stated, "Employee will be dismissed immediately in the event such behavior is

exhibited in the future."  (Id. at 2.)  The third and final warning, issued on August

25, 2003, was an exact duplicate of the second warning with a handwritten

addition noting that Rossman "commented to Tom Eiah how he was screwed out

of the GSB." (Rossman Dep. Ex. 8.)  Also attached to it was Rossman's July 31,

2003 efficiency report which rated Rossman as 90.88% efficient for the three-

month period of May, June, and July 2003.

On September 3, 2003 Rossman contacted the Department of Labor and

Industry regarding rehabilitation benefits.  Carol Norris, a qualified rehabilitation

specialist ["QRC"] was assigned to Rossman's case.  Norris visited RDO on

September 18, 2003 to conduct a work site review.  Ruegemer discussed Norris'

visit with Saar and possibly another RDO employee, Ryan Johnson.

Norris sent a letter recommending that RDO work with Rossman to permit

him to "safely remain in the same occupation" and that she would "[c]ontinue

communication with Mr. Rossman's employer regarding restrictions and

accommodations."  (Ruegemer Dep. Ex. 13.)  The date stamp indicates that

Ruegemer received the letter on October 7, 2003, although he claims not to remember when he read it.  Ruegemer sent a copy of this letter to Saar and Haley.

Rossman's employment was terminated on October 10, 2003.  The decision to terminate was primarily made by Ruegemer and Saar.  RDO may have made the decision a few days earlier.  Anne Haley, the benefits coordinator, was informed by Ryan Johnson at "the very end of September" that Rossman's employment would be terminated.  (Haley Aff. 2.)  Ruegemer's stated reasons for termination were "[b]ecause of lack of improvement in the areas outlined in the written warnings and the conduct/behavior of Mr. Rossman."  (Ruegemer Dep. Ex. 1 at 7.)  When pressed, however, Ruegemer admitted that there were no more events of insubordination and that this was not the primary reason for Rossman's dismissal.  RDO's efficiency records note that Rossman's efficiency for September 2003 was 95.30%.  Rossman's efficiency average for the last three months of his employment was 89.1%.

###### **B.**     **Evidence of Other Employees' Efficiency.**

Another service technician, Eric Gregorson, had efficiency ratings below the career path benchmarks.  Gregorson's efficiency for October 2003 was 76.25%.  Ruegemer did not issue any warnings to Gregorson relating to his inefficiency because Gregorson was a newly hired employee and RDO policy afforded him a ninety-day probationary period within which to accustom himself to the job.

### C.   <u>Marlin Kubitz's Termination.</u>

Marlin Kubitz worked at RDO for over thirty years.  Kubitz had a good work record at RDO, never having received any threats or warnings of termination.  On March 11, 2002, Kubitz was injured when he slipped and fell on the ice while working at RDO.  A workers' compensation payment was made to Kubitz in relation to his injury.  Two weeks later, on March 29, 2002, Ronald Saar terminated Kubitz's employment at RDO.  Saar and Ruegemer explained to Kubitz that he was fired because he failed to follow up with a customer.  Kubitz disputed this fact, believing that he had provided proper customer service.  Because Kubitz disagreed with his termination he requested a written reason for termination at which time he was offered and accepted a severance package.

## III.   PROCEDURAL HISTORY

Rossman filed this lawsuit against RDO on June 23, 2004.  Rossman's Complaint asserts one claim of Retaliatory Discharge in Violation of Minn. Stat. § 176.82 against RDO.  In RDO's answer, it denies the claim and asserts the affirmative defense of failure to state a claim upon which relief can be granted.

Through the present motion RDO seeks summary judgment on Rossman's sole claim of retaliatory discharge.

## IV.    ARGUMENTS OF THE PARTIES

### A.    <u>Procedural Standards</u>.

Summary judgment is appropriate if the evidence demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56; <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).  The non-moving party need not prove a material factual dispute, but must demonstrate the existence of specific disputed facts, not allegations or denials, that show a genuine issue for trial.  <u>Krenik v. County of Le Sueur</u>, 47 F.2d 953, 957 (8th Cir. 1995) (citation omitted)*;* <u>Hase v. Missouri Div. of Employment Sec.</u>, 972 F.3d 893, 895 (8th Cir. 1992).

The court must view the summary judgment record in a light most favorable to the non-moving party.  <u>Webb v. Garelick Mfg. Co.</u>, 94 F.3d 484, 486 (8th Cir. 1996) (noting that discrimination cases often turn on inferences rather than direct evidence); <u>Krenik</u>, 47 F.3d at 957 (inferences viewed in light most favorable to non-movant).  Finally, summary judgment should seldom be used in employment discrimination cases.  <u>Pope v. ESA Servs., Inc.</u>, 406 F.3d 1001, 1006 (8th Cir. 2005).

### B.    <u>McDonnell Douglas Burden-Shifting Analysis.</u>

Rossman alleges that he was discharged in retaliation for filing for workers' compensation benefits.  This action, Rossman argues, violates Minnesota Statute

§ 176.82, subdivision 1, which provides:

> Any person discharging or threatening to discharge an employee for seeking workers' compensation benefits or in any manner intentionally obstructing an employee seeking workers' compensation benefits is liable in a civil action for damages incurred by the employee . . .

Minnesota law applies the three-part McDonnell Douglas test to retaliatory discharge claims under § 176.82. Benson v. Northwest Airlines, Inc., 561 N.W.2d 530, 539 (Minn. Ct. App. 1997). To establish a prima facie case of retaliatory discharge under Minnesota law, plaintiff must establish that (1) he or she engaged in statutorily-protected activity; (2) an adverse employment action resulted; and (3) there is a causal connection between the two. Kunferman v. Ford Motor Co., 112 F.3d 962, 965 (8th Cir. 1997); Dietrich v. Canadian Pac. Ltd., 536 N.W.2d 319, 327 (Minn. 1995).

Once this prima facie showing is made, the burden shifts to RDO to show a legitimate, nondiscriminatory reason for its decision. Benson, 561 N.W.2d at 539. Rossman then has the burden to establish a genuine issue of fact regarding whether the proffered reason is a pretext for unlawful discrimination. Pope v. ESA Servs., Inc., 406 F.3d 1001, 1006-07 (8th Cir. 2005).

It is undisputed that Rossman pursued a protected activity, and that he suffered an adverse employment action. Therefore, Rossman has established a prima facie case if he can demonstrate a causal connection between these two

events.

### 1.   <u>Rossman's Prima Facie Case: Causal Connection.</u>

RDO asserts that Rossman's prima facie case fails because he cannot demonstrate a causal connection between his termination and the protected activity of filing a workers' compensation claim.

A claim of retaliatory discharge "cannot survive summary judgment merely because an employee is terminated after filing a claim.  The employee must demonstrate a causal connection between the claim and the termination."  <u>Smith v. Allen Health Sys., Inc.</u>, 302 F.3d 827, 832 (8th Cir. 2002).  There is no neat Eighth Circuit standard dictating what level of evidence is sufficient to demonstrate this causal connection.  <u>Id.</u> at 832-834.  Many courts have required something more than a temporal link to establish prima facie causation.  <u>Id.</u>; <u>Back v. Danka Corp.</u>, 335 F.3d 790, 792 (8th Cir. 2003) (holding adverse employment action shortly after the filing of a claim is certainly some evidence of causation, but it is not sufficient standing alone).  Retaliation claims require an employee to establish that the employer knew of the protected activity for causation to be successfully established.  <u>Kunferman</u>, 112 F.3d at 965.  Further, a "gap in time between protected activity and the adverse employment action weakens an inference of retaliatory motive."  <u>Hesse v. Avis Rent A Car</u>, 394 F.3d 624, 633 (8th Cir. 2005).

As set forth below, Rossman has established a causal connection through the combination of a temporal link  and other circumstantial evidence.

### a.   <u>Retaliatory Sequence.</u>

Beginning in the spring of 2003, Rossman's increased workers' compensation claims were directly followed by the first efficiency warning he received.  Although Rossman's original workers' compensation claim was filed over three and one half years before his termination, the last six months of Rossman's employment reveal a temporal connection between increased workers' compensation filings and Rossman's ultimate termination.  Notably, Rossman was fired just three days after Ruegemer received a letter from Norris outlining additional workers' compensation claims and requesting accommodations for Rossman, and just a few weeks after Norris visited the RDO plant to conduct her investigation.  This contact alone was sufficient to create a reason to retaliate against Rossman.

Similarly, the Court is not convinced that Ruegemer's concerns regarding Rossman's efficiency undermine causation in this case.  The Court acknowledges that "evidence that the employer had been concerned about a problem before the employee engaged in the protected activity undercuts the significance of temporal proximity."  <u>Logan v. Liberty Healthcare Corp.</u>, 416 F.3d 877, 882 (8th Cir. 2005) (citation omitted).  Viewing the evidence in the light most favorable to Rossman,

RDO has not shown that Ruegemer had more than a passing concern regarding Rossman's performance before February 2003. Accordingly, the Court finds that a retaliatory sequence of events combined with the additional factors set forth below establishes causation in this case.

**b.    <u>Decision-makers' Knowledge of Rossman's Claims.</u>**

Rossman asserts that Ruegemer's knowledge of the escalating workers' compensation claim further supports causation in this case. RDO, however, contends that Ruegemer was not aware of the spring 2003 claims.

Construing all evidence in the light most favorable to Rossman, it is clear that Ruegemer knew of the original May 2000 claim. Ruegemer received inquiries from Liberty Mutual regarding the claim and may have suggested to Rossman that rather than filing a claim, he submit claims for doctors' visits directly to RDO. Despite Ruegemer's testimony that he was unaware of any workers' compensation claims during the spring of 2003, there is enough evidence to create a fact issue as to whether Ruegemer was aware of the claims. First, Ruegemer admits that he knew of Rossman's injury and was aware that Rossman missed one week of work during April 2003. In relation to the May of 2000 claim, Ruegemer stated that, "I knew that he was making a claim for his injury because obviously it occurred at work." (Ruegemer Dep. 48.) Second, Ruegemer admitted that sometime during the summer of 2003 he discussed with Saar the

need to "be careful" and follow progressive discipline so as to avoid the appearance of firing Rossman because of his injury.  (Ruegemer Dep. 98.)  Third, evidence that Ruegemer suggested that Rossman refrain from filing the initial time off claims could lead to an inference that Ruegemer kept himself generally apprized of the status of workers' compensation claims.   In any event,  Ruegemer would definitely have been aware of Rossman's claims by his September 2003 meeting with Norris regarding the claims.  Accordingly, Ruegemer's knowledge in this case supports an inference of causation.

### c.    <u>No Final Termination Event.</u>

Focusing on the last month of his employment, the fact that there was no final termination trigger such as further insubordination or any final disciplinary document further supports the inference that Rossman was terminated because of his pursuit of workers' compensation.  The third and final written warning was given to Rossman on August 25, 2003.  This warning was a photocopy of the second written warning, with a handwritten notation regarding a comment made by Rossman added to it.  Attached to the third warning was Rossman's July 31, 2003 efficiency report which rated Rossman as 90.88% efficient for the three month period of May, June, and July 2003.  The absence of a similar disciplinary document in September or October combined with the fact that Rossman's performance had improved further supports causation in this case.  Rossman's

September efficiency rating improved to 95.30% and Ruegemer admitted that

Rossman made no further derogatory remarks after the third warning.  Notably,

while there was no disciplinary action during September, there were three

workers' compensation related events.  First, Rossman called the Department of

Labor and Industry on September 3, 2003, seeking assistance in finding a QRC.

Second, Norris visited RDO on September 18, 2003 to conduct a work site review.

Third, Ruegemer received Norris' letter on October 7, 2003.  Thus the lack of any

termination event aside from protected activity during September supports an

inference of retaliation.

Additionally, the Court finds it telling that the written warnings did not

state that Rossman could face termination if he failed to raise his efficiency.

Instead, the warnings provided that a failure to comply would result in the

reduction of pay commensurate with the efficiency level at which Rossman was

performing.  This discrepancy between what the warnings stated could happen

and RDO's ultimate decision to terminate Rossman is additional evidence

supporting causation.

### d.    <u>Similar Termination of Marlin Kubitz.</u>

A similar situation regarding a fellow employee provides evidence linking

Rossman's termination and his application for workers' compensation.  Marlin

Kubitz testified that he had a clean employment record when he slipped and fell

16

at work.  Kubitz was fired, allegedly for improper customer service, just two weeks after submitting his workers' compensation claim.  At the time, Kubitz denied that he had given poor service to any customer and challenged RDO's justification for termination.  According to Kubitz, the same decision-makers involved in the present case, namely Ruegemer and Saar, played a part in the decision to terminate him.  After Kubitz requested a written explanation of his termination, he was offered a severance package.  The Court finds that this sequence of events relating to Kubitz and involving the same supervisors bolsters causation in this case.

### e.  <u>Use of Compensatory System to Terminate Rossman.</u>

Finally, the Court finds that the way in which RDO used the Kilands system further supports causation.  Because the Kilands system was not designed to be used as a disciplinary tool, it may have been manipulated to mask RDO's retaliatory actions.  Kilands was not designed for discipline and contained no variables to account for an injury-related slow-down in productivity.  Kilands was designed solely for use with John Deere equipment, yet RDO used it to evaluate Rossman even when he was assigned jobs on other types of equipment.  Because the system contained no set calculations for those machines, this implementation may have set Rossman up to fail and contributes slightly to a finding of causation in this case.

In conclusion, Rossman has shown enough evidence to satisfy the causation element of the prima facie case.  While timing alone is insufficient to establish causation, Rossman presents other categories of evidence that compliment the sequence of events and give rise to an inference of retaliatory animus.  Back, 335 F.3d at 792.  Taking into account that establishing the elements of a prima facie case is not considered "a difficult or onerous burden," Rossman has alleged sufficient evidence to support an inference of causation.  Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995) (citation omitted).

## 2. **RDO's Legitimate Reason for Terminating Rossman.**

As Rossman has succeeded in establishing material factual disputes on the prima facie case, the burden shifts to RDO to "articulate some legitimate, nondiscriminatory reason for the employee's rejection."  Hase v. Missouri Div. of Employment Sec., 972 F.2d 893, 896 (8th Cir. 1992) (citation omitted).  As with the prima facie case, the Eighth Circuit has held that the "burden to articulate a nondiscriminatory justification is not onerous."  Pope v. ESA Servs., 406 F.3d 1001, 1007 (8th Cir. 2005) (citation omitted).

RDO has met this burden by demonstrating that Rossman's poor efficiency rating over a period of six months and his occasional insubordination were the causes for termination.  A series of progressive discipline steps were followed, including a verbal warning and two written warnings.  RDO established a set

efficiency requirement for its service technicians and included this in their job
descriptions.  Ruegemer met with Rossman on at least three occasions to discuss
Rossman's performance issues before his job was terminated.  This process meets
the nondiscriminatory justification requirement, and Rossman does not appear to
contend otherwise.

### 3.   Rossman's Evidence of Pretext.

The burden now shifts back to Rossman to present evidence sufficient to
create a genuine issue of material fact regarding whether RDO's proffered
nondiscriminatory justifications are mere pretext for discrimination.  This
evidence can take the form of either direct evidence that a discriminatory reason
likely motivated the employer or indirect evidence that employer's proffered
explanation is unworthy of credence.  See Potter v. Ernst & Young, LLP, 622
N.W.2d 141, 146 (Minn. Ct. App. 2001).

The Court concludes that Rossman has presented a material factual dispute
regarding whether RDO's proffered nondiscriminatory reason is pretextual.  A
plaintiff has presented sufficient evidence of pretext upon a showing that the
employer used an efficiency system capable of manipulation as its proffered
nondiscriminatory reason for termination.  Id. at 146.  Potter, was also a
retaliatory discharge case.  (Id.)  In Potter, the Minnesota Court of Appeals held
that the employer's proffered reasons for termination, essentially that Potter was

no longer billing efficiently and that his skills no longer matched the employer's

needs, were sufficiently dubious for the case to survive summary judgment.

Potter raised the following issues with the employer's justification:

a.  the employer's mechanism for measuring billing efficiency was
    not completely objective and Potter's efficiency was "largely
    within the control of his superiors," including assignment to
    non-billable work;
b.  employees with similar or lower efficiency rates were not fired;
c.  a challenge to the accuracy of efficiency calculations;
d.  the HR department had noted concern that there was
    insufficient documentation to support the articulated reason
    for Potter's discharge.

See id.

This case shares many similarities to Potter.  Because it is a retaliation case,

it is more closely aligned with this case than other discrimination-based cases.

Much like Potter, RDO's proffered explanation is based on Rossman's efficiency

rating.  Rossman challenges the objectivity of the Kilands system in a similar

manner to the way in which Potter challenged his employer's system.  As a newly-

implemented system, Kilands was vulnerable to discriminatory application.

Furthermore, as in Potter, the Kilands system could be manipulated by supervisors

who assigned employees to specific projects.  Rossman was given many off-breed

jobs and it is possible that the assignment selection contributed to Rossman's low

efficiency level.

Citing Miller v. CertainTeed, RDO argues that Rossman is required to show

that his workers' compensation claim was handled differently that those of other employees.  Miller v. CertainTeed, Corp., 971 F.2d 167, 171 (8th Cir. 1992).  RDO further insists that Rossman must show that others similarly situated were treated differently with respect to the service technician efficiency ratings.  Logan v. Liberty Healthcare Corp., 416 F.3d 877, 882-83 (8th Cir. 2005) (citation omitted).

RDO's reliance on these cases is distinguishable.  Both Miller and Logan are cases dealing with discrimination.  It is therefore understandable that the court in each of those cases required a showing of differential treatment as that is the behavior at the heart of a discrimination claim.  In the retaliation context, however, the Court observes that it is not necessary to show disparate treatment because an employer could retaliate against a workers' compensation claimant regardless of how it treated other employees.  While evidence that an employer processed hundreds of other employees' workers' compensation claims without issue could be significant in a case such as this, RDO has presented no such evidence.  See Miller, 971 F.2d at 171.  In fact, the only evidence of another workers' compensation claimant in the record is that of Kubitz who was also terminated two weeks after filing a claim.

Rossman has established sufficient evidence to establish that RDO's reason may be pretextual.  Rossman provided a material factual dispute regarding whether the Kilands system was used discriminatorily.  The evidence regarding

the termination of Kubitz, the only other workers' compensation claimant, combined with the failure of the warnings to note that termination could result if Rossman did not increase his efficiency further establish that RDO's proffered reason may be pretextual in this case.  Viewing all evidence in the light most favorable to Rossman, he has established that RDO's proffered reason for termination was pretextual.  Thus, the Court denies RDO's motion for summary judgment.

Accordingly, based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.     RDO's Motion for Summary Judgment [Docket No. 23] is **DENIED**.

Dated: March 1, 2006                              s / Michael J. Davis
                                                  Judge Michael J. Davis
                                                  United States District Court